We're probably going to go back home and go to a video store and get cool hand luke out to find out what you're talking about. Thank you all. Thank you. Next is Nuffer v. Malala River School District. Well, let me first, what we have here will not be a failure to communicate. We don't know how to say anyone's name. And the names are Chris Nuffer v. Malala River School District. Malala, I always seem to get the L's in the wrong place. Let me start with saying first, of course, the standard of review, part of that is that this evidence must be viewed in the light most favorable to Chris Nuffer. And that, with the district court's rather brief opinion, I think this court could find that was not done. I think you've got to argue something more than the opinions you read. You've got to show us some genuine issue of fact. It's material beyond the science. Okay. It needs to be succinct for many reasons. Right. And I believe the first issue is whether or not her speech was on a matter of public concern. And when you view that speech, you must also view it in the context of what happened to the actual facility she was at, that she was advocating for, and that is that the math school closed. And it did it after an audit by auditors basically agreed with what she had been previously arguing about. The audit showed that. The speech you're talking about is in the letter that she wrote complaining about the audit. That's part of it. That came out in February. And when Dr. Erickson came back from a brief vacation, first she sees this letter, and the next thing that happens at about this time is the husband of the principal witness against my client complains about something about Ms. Newfer, and they immediately call her up on Sunday and say, don't go to work on Monday, and you're barred from the school, and don't come back, don't talk to anybody. You can't talk to parents, students, or staff. And then two months later, they finally come up with a reason to dismiss her. They don't come up with that until May. So you have to look back at the speech. Her first speech after the audit is she's telling the business manager, Lovejoy, no, you can't just bury this issue about whether or not there's a nonprofit corporation or whether or not there's a separate bank account, nor are the monies being passed through according to the statute. You have to go and do that. And this is the central nexus in this case between her speech and her advocacy and the wrongfulness of what the district was doing. The superintendent didn't want to lose control over the school or Ms. Newfer or the funds. Counsel, there's a link in the argument that I'm missing, and I want you to educate me. Certainly. It should be there. And that's causation. It looked to me like the reason that she was fired wasn't her speech. It was being a bad employee. And the question is, was that the basis? Was it pretextual? And I look at it. It looks like what they have her on is discipline was out of hand at the school. She couldn't get the students to behave. She claimed enrollment of students who weren't there. She was verbally abusive to students and staff. She was supposed to be taking, teaching a course on filmmaking, but she never showed the students how to use a camera. She didn't submit her grades. She didn't fill out and send in the paperwork for a grant that she was supposed to be applying for. It looks like they've got her, and it's not pretextual. So I don't see the causal link. Well, it's not just pretextual. Well, that's why I also cite the recent Staigle case, because I think if you look at that rather persuasive evidence that you've just cited, you have to take a look at this also on a mixed motive basis, because they didn't come up with these reasons later. Mr. Goodhart, aren't you collaterally a stop to deny those bases for her termination where she fully litigated before the State Board and then it was affirmed on appeal to the Oregon courts? No. Judge Anna Brown's opinion in the Burgo versus Canby case addresses that. And it addresses, and I cite to that my reply briefing. And Judge Brown was relying on an earlier Oregon Supreme Court case and Ninth Circuit case, and it said first specifically reviewing an FDAB opinion. And the issues in the FDAB case that she was reviewing, and of course here, is not identical to the cases in this free speech case and whistleblower case. And so, no, you don't give it preclusive. I'm not sure you understood my question. Maybe I haven't understood your answer, so let's start again. There's no preclusive effect at all in the court of appeals opinion, not at all. Even though those were the grounds that both the State Administrative Board and the Oregon appellate courts found justified her termination. No, even though that's what they found justified it. Now, I will agree. And you said it's a matter of Oregon law? That's a matter of Oregon law and Ninth Circuit law, the Ninth Circuit law that Judge Brown was quoting in Burgo v. Canby. Now, I will say this, and this is one reason why I go on to cite Stagel, this most recent case, is if we look ahead at what would happen at a trial. I do agree. Which is the case that says there's no collateral estoppel? Burgo v. Canby. That's the Burgo v. Canby School District. I cite that in my reply brief. It's the second case listed. District court case. That's a district court case, and in that, Judge Brown is relying on a Ninth Circuit case and also an Oregon Supreme Court case reviewing what Oregon's rules are regarding that. Can you give me the Ninth Circuit case that she relied on? I do have Burgo back at my table. I'll get that, and I'll give that to you in rebuttal. I think you've written it down here, Worley. Yeah, Worley is the one case. Is that W-U-R-L? W-I-R-H-L, I believe, I. I think there's an I after that. Now, what could happen, though, and I encountered this in another case that you may be familiar with, Settlement v. Portland Public Schools. In that case, there was a case where, well, a grievance went through arbitration,  and Oregon Supreme Court, U.S. Supreme Court case law, of course, says, well, yes, it can, but it's not preclusive. It's evidence just like any other. And I think that's what would happen to both the court of appeals and the FDAP findings. It would be evidence. It may have some persuasion, but the juror is the prior of the fact. Let's say you're right on that in your response to Judge Tallman. I don't know if you are or not, but let's say you are, okay, that there is no collateral estoppel. Why, nevertheless, wouldn't a court have to find that no reasonable jury could conclude otherwise? Because here I think the temporal argument actually works against the school. They bar her immediately after her speech when she's saying, no, we can't do it that way, and then she contacts the Oregon Department of Education and tells Lovejoy, no, you can't just bury this thing. You have to fix it if you want to go forward, because that can lead to having to repay monies to other school districts. And then this other incident, opportunity, comes up in February to bar her from the school. Then it's not until May that they come up with these other reasons to discharge her, the principal one being the attendance issue. Well, wasn't there an issue that she was keeping kids on the rolls of the school when they weren't attending the school? That actually goes, well, we don't have any evidence that they gave any money back. In fact, we have evidence to the contrary. Isn't that one item struck me as so serious that I wondered if just it alone, apart from not grading the students, the whole other litany Judge Heinfeld mentioned, if that alone would be a justification to can her and get her out of there? No, that actually goes to the disability issue. There was a basic misunderstanding, especially by Mr. Willie and the other gentleman who went through the school, and you can't just walk down the halls and look in classrooms and say, gee, it doesn't look like we have 100 students attending here. There's two basic ways of keeping attendance. And for students in an alternative setting, and many of the students with disabilities were, some students didn't have the health condition that would allow them to attend school every day. That's why they were in an alternative school. The question was, are they counted in a program? And if their program is being supervised, even if they're attending somewhere else, if their program is being supervised by the instructor, then that's sufficient for them to be counted in the program of instruction. So in many cases – That sounds kind of like an issue. I'm thinking if a doctor says that patients were in his office, Medicare or Medicaid patients, and they weren't in his office, he goes to jail. You're saying that a school principal can say the students were in the program even though they don't show up at school? No, what I'm saying is that the Oregon Administrative Rule has both a seat time alternative and a program alternative of how you count students. And for students who are qualifying in an alternative program, such as a student with a disability, the question is, is that student following his IEP? And what does that IEP require? Supposing it requires that one particular teacher give him independent study work and oversee his work, and that student come in once a week or once every two weeks and check with the progress. And maybe the teacher should go out and do a home visit to actually see if the student is doing work there. And these are what many of these students had. We had young students, female students, who were pregnant. We had students who were very ill and couldn't get to the school every day. And so we had students who were also counted not just by seat time, but that would be comparable to a physician and did he really have hands-on in his examination room, versus students who were approved in their IEPs to participate in a program and be overseen in this way. For example, the- So is there evidence that the ones who were counted as there and weren't there were being overseen in some independent study program? Yes, there was evidence of that. There was testimony by Ms. Newfer, who was the counselor, and there was evidence from another gentleman who testified at the FDAP hearing, and his evidence was also in there. But the evidence we relied on primarily was with her- Ms. Newfer's knowledge of the students and what programs they were in. I don't think there's really any- Well, I think this court can find that Ms. Newfer was speaking out on matters of public concern. I think the district court was clearly wrong there. She was complaining about compliance. She was saying to Ms. Lovejoy, the business manager, that, well, you know, we need to incorporate and we need to get the funds in a separate bank account. When they disagreed with her, well, let's meet in January and talk about that. Then she talked to the Oregon Department of Education, and the email there was supporting her on attendance, and she testified in her own deposition that she also spoke to school board members about this issue. The money that was supposed to- Everyone is representing this as a charter school, but if you have this- But if this is a charter school- It was not, but they were representing it was, and they had 20 students out of 100 that were from other school districts. Under Oregon law, if it is a charter school, they don't have to ask those other school districts for permission to take their child, and the money follows them to the school district. Well, 95 percent of that money is supposed to be funneled through to the school. Well, we had 100 students, about 5,000 apiece. On the policy issue, is there any evidence that your client was also taking steps to push for the 501c3 status and the requirements that the Oregon Court of Appeals found to be dispositive on the charter school issue? When we got to May of the year she was dismissed, when we got to May 2001, she met with her governance committee, and in fact, in the supplemental excerpts of records that the appellees put in, the articles of incorporation are there. She signed those on May 30. She was dismissed on June 6. So despite the fact that they told her, don't communicate with anyone on the staff, don't talk to parents, once this controversy got underway and the dismissal action got underway, she went ahead and did it anyway. And how long had the school been in operation at that point? That was the end of its second year. She was the original director, is that right? Right. The evidence also is that she, and here's where we have a dispute of fact, she testified that, I asked Dr. Erickson, are we in compliance, and did we check with our lawyers, and she says that Dr. Erickson told her everything is okay. Dr. Erickson's testimony that's in the record basically says, well, if I had that conversation, I don't remember. She doesn't disagree. She says, I don't remember doing it. Later on, after the audit, when I questioned Dr. Erickson, well, if this audit shows that you've, you know, you've misapplied funds or you've misappropriated funds because, in fact, there was no charter school, I asked her, do you plan to fix it? And she said, under advice of counsel, no, I don't, we don't plan to fix it. So basically. They closed the school, didn't they? Right. But in those two years, they received hundreds of thousands of dollars. We basically have a $400,000 issue here. $200,000 a year was being received and not channeled. Counsel, it seems to me that we're a little off track there. Okay. Basically, the issue is not whether the school board was right or wrong in thinking she was a bad employee and not doing her job well. If they were wrong, they still prevail, even if she was a wonderful employee and was doing a great job at the school, because your claim is a constitutional one. It's not a claim on the merits of how good a job she was doing. It's your burden of proof to show that constitutionally protected speech on a matter of public concern was a substantial or motivating factor for the adverse employment action. So my thought is, even if she was right and they were wrong on her counting students as in attendance when they weren't in attendance, because they just had these crude minds and they didn't understand independent study and all this, and she was right and they were wrong on whether she did the necessary paperwork for the grant that she was supposed to do paperwork for, and she was right and they were wrong on all these other things that we went through, nevertheless, if they fired her because of those things that they were wrong on, they win. They you win only if you show that constitutionally protected speech on a matter of public concern was a substantial or motivating factor for firing her. And that's the link in the argument I'm still having trouble with. And the link goes to the attendance issue itself. And I don't care if they're wrong. I don't care if she's right and they're wrong. All I care about is did they fire her because they thought wrongly that she was falsifying attendance records, or did they fire her for protected speech on a matter of public concern? Well, the recommendation to fire her came from Dr. Erickson, and this is the person who, as Chris Newford testified, wanted to bury the issue on the audit. And so a way to do that, frankly, is to close the school, because that's the best way to get rid of the strongest advocate. Erickson can't actually fire her, can she? What? Erickson can't actually fire her. That's why they go through all these hearings before the school board. It's a volunteer school board and you've got a superintendent who's the paid staff member who makes the recommendation. Right, but it's the school board who actually holds a hearing before she's actually officially terminated, right? Right. Okay. By the way, just to clarify, I was under the impression that your client, Newford, was alleging that this was a charter school initially. Yes, everybody was acting that way. It's a charter school, so you can't fire me or I have some other rights. That's the position we took. I want to see how it would help your client that as for a whistleblower claim, that it's later been determined that it wasn't a charter school. Well, let me just say one thing and I'm going to save my minute and 50 seconds and sit down. Under the Oregon whistleblower law, it's not just speech. It's also the restraint of the speech or the threat to do something. In this case, so it actually reaches further and she doesn't have to actually report to anyone. But it's interesting that the school district never took a position on was it a charter school or was it not a charter school until after the notice of appeal was filed in this case. They never took that position until October of 2002. Thank you. Thank you, counsel. Counsel? May it please the Court. Lisa Lerer, appearing on behalf of the Malala River School District. I have with me Rich Cone Lee who is representing the individual defendants separately and to the extent there are questions that focus on any of the individual defendants, he'll be happy to address them. So he represents Dr. Erickson. I'm sorry? He represents Dr. Erickson. Individually, yes. I'd like to start off with this question about collateral estoppel and how that applies under Oregon law. Plaintiff has cited in his brief the Virgo case which Judge Brown decided and refers to the Nelson v. Emerald People's Utilities District case in which the Oregon Supreme Court set out the elements that are involved in determining whether an administrative proceeding will be given the same preclusive effect as a state court judgment. And he's identified the elements there. And if you look at pages 33 through 35, actually 36 of our brief, we go through and explain how each of those elements is met. And I believe that under both state law and federal law, the FDAB's decision in this situation is, in fact, entitled to preclusive effect. Now, it's true that the FDAB did not consider any First Amendment issues or any whistleblower issues or any of that. But the FDAB did decide many factual issues that should be preclusive in this case in connection with the nature of the allegations in plaintiff's complaint. The FDAB concluded that there were no alternative motives for what the district did, that plaintiff had, in fact, falsified the intendant's records, that she had, in fact, failed to provide proper education. Excuse me, counsel. You're talking a little faster than me. Sorry. The acoustics aren't so good. And I'm having trouble just understanding what you're saying. Okay. The FDAB found that, in fact, she had falsified the intendant's records. Plaintiff is challenging some of this analysis based on an e-mail, which is included in the record, and based on some of the administrative rules that deal with how you do the counting. But it's important to distinguish between two types of regulations here. There are regulations that address whether a student can get credit for different types of work, different types of programs, versus how you count attendance. And FDAB clearly ruled that the evidence plaintiff was relying on in an effort to establish why she was counting attendance the way she was did not apply, that it applied to counting credit in terms of students obtaining credit towards graduation versus counting attendance for students participating in a program for which the school is entitled to receive funding. The FDAB has resolved that issue, and under the analysis of the Emerald Pacific case, and as I said, we've detailed the elements of that in our brief, that should be entitled to preclusive effect. It also the other elements that are entitled to preclusive effect are the issues with respect to Cindy Nichols and her participation in this. Plaintiff has attempted to make an issue out of the fact that it was her child and her husband who made the complaint that got Ms. Newber removed from the building on the day she was removed. The FDAB made it very clear that Ms. Nichols had nothing to do with that, that it was entirely separate. I think you have to go back and look in terms of if you're going to talk about motive here and why the district might have done this, you have to go back and look at the entire record in connection with the prior notices to Ms. Newber about her relationship with students, parents, and staff, her prior abuse of language, her failure to control students, the harassment that was going on. On the day that she was removed, the day she was given this letter, which sets out the nature of the complaints against her, it was yet another incident of the type of problems they had in the past. Do we even need any of this? I don't think we do. I think we can go back to the question of whether this is. I'm trying to think. Here's the way I analyze it. First Amendment, all I care about is did they protect, did they fire her on account of protected speech. I don't care whether she was a great administrator and wrongly slandered. And Rehabilitation Act, what I care about is an advocate for the disabled as opposed to somebody who is disabled, a protected person there. State whistleblower, was she fired for whistleblowing or was she fired for something else, rightly or wrongly? Is my analytic scheme correct? Absolutely. And I think if you want to hit the Rehabilitation Act claim, she's not a protected person. And even if she can try to build an argument that somehow she is by advocating for protected students, there's no evidence in the record that that actually happened. Can you build such an argument? I don't think you can. I don't think there's any case law that supports that her advocacy on behalf of her protected person makes her a protected person under the Rehabilitation Act. With respect to the whistleblower case that precludes that? I'm not aware of one, no. Do you happen to recall or have with you the statutory language? On the Rehabilitation Act? I was looking at it, and it looked to me like the persons protected were otherwise qualified individuals with a disability. Correct. And I actually don't have that information. I need her to have a disability before I get to first base. Right. And she's obviously not a student with a disability. She's the administrator. Does she claim to be disabled? No. She claims to have advocated on behalf of disabled students. It doesn't talk about that. No, it doesn't. It says individual with a disability. Correct. And so I don't think she qualifies at all. Does she claim to have a disability? No. Is that the end of it? I think that's the end of it for the Rehabilitation Act claim. And we've made a very short argument in our brief along those lines. With respect to the whistleblower. I don't want to get bogged down in arguments where we don't have to decide it. There's just no – it's bad judging to decide a lot of things you don't have to decide. Absolutely. With respect to the whistleblower claim, she's arguing that her arguments in connection with the state audit and the fact that funds had been distributed to MAPS under the federal program as a charter school applicant. It's important to recognize the language of the statute under which the grant was made. This is a charter school applicant. And they were at that time making application. But in addition to that, this is not a situation where she went to the State Department of Education and said, hey, there's a problem. Somebody – the State did the audit. The State presented the issue to the Malala River School District. She was called and said, what about this? They say we haven't complied. She then continued with the argument that, you're right, we haven't complied. These are the things we need to do. She didn't report this. And she's not whistleblowing something that she has discovered a problem. I don't think that her discussions involved whistleblowing in any event. She was working with people within the community, both with the school district and with her governance body, to try to establish or do the things that needed to be done. This is discussion within a government agency about what we need to do and how we need to go about it. And it's not – it doesn't reach the level of the kind of thing where somebody is attempting to clean up a – to report a problem that no one else knows about. If you go back to the First Amendment claim and we deal with the question of matters of public concern, it's very easy to get bogged down in the idea that some of the things that she categorizes her comments as, including things like misuse of public funds and that sort of thing, can in many circumstances be matters of public concern. But we have to look at the circumstances in which all of this arose. She's not going out and talking to people about the misuse of public funds. She's working within the organization. She testified that the discussions she had with the Department of Education, the discussions she had with the school board, were in her capacity as a member of the governance committee attempting to address these issues. She's not going out and reporting or trying to address outside issues. If you look at her letter to the Accreditation Committee, she agrees, and she has agreed, that this accreditation with a warned status needed to be addressed. She responded with a very stinging letter to the Accreditation Committee, and Dr. Erickson did not take issue with the fact that an appeal was made. It was the way that it was done, and that was in line with the prior warnings, criticisms, constructive attempts to deal with her problems of relating to other people within the school district, with students, parents, staff, and it's just another example of the problems that creates. And then the problem it created for the school district in trying to deal with resolving the dispute with the NACS when there's this very harsh letter having been written. Her complaints about the way students were assigned to MAPS, this becomes sort of a confused issue given the rise that MAPS is not a charter school and the rules that she has attempted to rely on to support her decisions about MAPS are tied to the charter school thing. But we've also got the problem that attendance was miscounted. The FDAB found clearly that she directed Cindy Nichols to do the attendance the way she did. Had attendance been properly counted, it would have been clear that there were more positions available and students were not receiving the services they were entitled to. The issues about the special education is another area where it's easy to fall into the idea that she's talking about matters of public concern, but when you get into the circumstances of what was going on, these were disagreements among Ms. Neufer and the special education teacher about whether students indeed qualified for special education benefits. When she got down to discussing specifically the types of problems she was having in connection with special education, she started off talking about money not following the students, but then admitted that there was no situation where they didn't get the money that they eventually needed. You'll find these at the supplemental excerpt of record, page 66. She said that sometimes they had trouble initially getting supplies that she thought they needed, but eventually they got the supplies they needed. Again, these were disputes within the district about how these students should be classified, and when she would order supplies, sometimes the school district person who actually does the ordering thought other supplies were better. These are internal district disputes. These are not matters that somebody is bringing to the attention, the mismanagement of the school or something like that. The issue that she brought up about being prohibited from talking and having her First Amendment rights quelled by the order from the district, when she was asked to not return to the school, she was told that she could not come to the school and she could not contact students or staff during the school day. She was never told not to contact parents. She was never told not to contact the governance committee. She was never told not to contact the school board. And she was not told not to contact teachers or students outside the regular school day. What was the reason for that, to protect the integrity of the district's investigation? Of the investigation, yes. And it was simply a matter of having Mr. Kosick be able to come in and talk with the students and do his interviews without any influence in any other way. The issues about the supposed retaliation in the sense of micromanagement, the Dr. Erickson was aware throughout the situation that you had problems with her communications with other students. They have had complaints. Of course she's going to monitor the situation and determine what happens. There's nothing in here that has a situation where somebody is expressing matters of public concern that go outside the simple internal administrative management of the district. Even if you could find a matter of public concern, there's just no way to demonstrate here that her speech, if there is any there that's connected to anything, is the motivating factor in the decision to terminate her employment. She was reassigned to work at home on the base of a complaint that was investigated. She was eventually terminated based on many findings about totally inadequate conduct on her part. And if you start, if you want to go one step further and get into the Pickering balance, this is certainly a situation where the government has a right to deal with how the particular services it's providing are going to be provided and managed. And certainly it wasn't being done under the circumstances that existed when she was the director of MAPS and they had someone else step in and try to fix the problems and they couldn't even be fixed. The grant thing couldn't be fixed. The problems with students who had been transferred to the community college because there had been conflicts. All of those things created a situation that clearly cried out for the government to take an action. Let me ask you a question. I agree with the statement of the issue by my colleague, Judge Kleinfeld, during the appellant's argument. That is, that the appellant has to show that some protected speech was a substantial motivating factor for a person's appointment decision. My question is, if there's no, if there's inadequate evidence of causation to raise a genuine issue of material fact, looking at the record and looking at everything in the light most favorable to the appellant, do we ever reach the Pickering balance? No. You never get to that point. No. Unless the Court has other questions, I have nothing to add. And if you have questions about the individual defendants, Mr. Conley would be happy to. No? Thank you. Is there anything you wanted to say? Not unless the Court has specific questions. I don't. I don't. Counsel, I think you saved a short time for yourself. Yes. Let me answer just a few questions, a few things you raised. Set the clock so that it's limited appropriately. Okay. The first is on the Rehabilitation Act. There are administrative rules that protect people who are advocates. Where I was looking at the Rehabilitation Act, I've got the statute that I brought with me, and it looks like the statute just protects qualified individuals. So the enforcement provisions that the Rehabilitation Act is that it follows Title VI of the Civil Rights Act of 1964, which includes protection of people who are advocates. You might also look at the site. Read the words. I don't have the site with me. Do you have the words? No, I don't. But you might also look at the GLAD case. That's that Los Angeles case about students with disabilities. And in that case, they protected an advocate. GLAD is an acronym for Greater Los Angeles Area on Disabilities. Let me go back to the one letter that was speech protected that was part of the reason for her dismissal, was her letter to the accrediting commission. That was the first thing that happened in February. And Dr. Erickson admitted in her deposition that that was part of the basis of her dismissal. So that is protected speech. You have to look at this in the totality of the circumstances. She writes a letter to the auditor basically blasting the accreditation audit that was done, and you say that is protected speech? Well, this is what a lot of bureaucrats would do, is when they're really saying, I don't like what you said, they say, oh, well, it's the term. It's actually the letter itself that was sent. But you're missing my question. My question is, if you write a letter to the auditor saying, however disrespectful or respectful, you know, I disagree with the results of your audit, how does that make it protected speech? It's that she sent the letter at all is the real problem, and that's really why they got rid of her. And a rational jury could decide that, because there Chris Newfer is demonstrating some autonomy. And that's the last thing that Dr. Erickson wanted. She wanted this to be a charter school in name only so that she can get the money and then misappropriate it. But when it comes down to treating her with some autonomy, oh, yeah, I agree with everything you say. I just don't like the tone of the letter. She didn't like the fact that she sent the letter at all. Well, she had to send the letter because the appeal period for disagreeing with the warning status would expire. What's the evidence they fired her because she wrote a letter expressing disapproval of the audit? That was one of their findings, is that the tone of her letter. In other words, she was unprofessional. That's the word they used. And so that's one of the findings. Thank you. Thank you, counsel. Thank you. Newfer v. Malala is submitted. Do you want to take a break? Did he say yes? We'll take a ten-minute recess before the next case. All rise. Thank you.
judges: Kleinfeld, Gould, Tallman